**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| AMY HUGHES,<br>*Plaintiff-Appellant,*<br><br>v.<br><br>ANDREW KISELA, Corporal,<br>0203; individually and in his<br>official capacity,<br>*Defendant-Appellee.* | No. 14-15059<br><br>D.C. No.<br>4:11-cv-00366-FRZ<br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
Frank R. Zapata, District Judge, Presiding

Argued and Submitted September 12, 2016
San Francisco, California

Filed November 28, 2016

Before: Ronald M. Gould and Marsha S. Berzon, Circuit
Judges, and William K. Sessions III,[*] District Judge.

Opinion by Judge Sessions

---

[*] The Honorable William K. Sessions III, United States District Judge
for the District of Vermont, sitting by designation.

# SUMMARY[**]

### Civil Rights

The panel reversed the district court's summary judgment in favor of a University of Arizona police officer and remanded in a 42 U.S.C. § 1983 action in which plaintiff alleged that the officer used excessive force when he shot her four times.

After receiving a report of a person hacking at a tree with a knife, police officers responded to the scene and upon their arrival saw plaintiff carrying a large kitchen knife. Plaintiff began walking toward another woman and did not comply with the officers' demands to drop the knife. Unable to approach the two women because of a chain-link fence, defendant shot plaintiff four times.

The panel held that material questions of fact, such as the severity of the threat, the adequacy of police warnings, and the potential for less intrusive means were plainly in dispute. Defendant therefore was not entitled to summary judgment with respect to the reasonableness of his actions.

The panel further held that defendant was not entitled to qualified immunity. The panel determined that the facts, viewed in plaintiff's favor, presented the police shooting a woman who was committing no crime and holding a kitchen knife. While the woman with the knife may have been acting erratically, was approaching a third party, and did not

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

immediately comply with orders to drop the knife, a rational jury—accepting the facts in the light most favorable to plaintiff —could find that she had a constitutional right to walk down her driveway holding a knife without being shot.

## COUNSEL

Vince Rabago (argued) and Stacy Scheff, Vince Rabago Law Office PLC, Tucson, Arizona, for Plaintiff-Appellant.

Robert R. McCright (argued), Assistant Attorney General; Thomas C. Horne, Arizona Attorney General; Office of the Attorney General, Tucson, Arizona; for Defendant-Appellee.

## OPINION

SESSIONS, District Judge:

After receiving a report of a person hacking at a tree with a knife, three members of the University of Arizona Police Department (UAPD) responded to the scene. Upon their arrival, the officers saw Plaintiff Amy Hughes carrying a large kitchen knife. Ms. Hughes then began to walk toward another woman, Sharon Chadwick, at which point the police yelled for her to drop the knife. Ms. Hughes did not comply. Ms. Chadwick has submitted an affidavit in which she describes Ms. Hughes's demeanor at the time as composed and non-threatening. Multiple witnesses attest that Ms. Hughes never raised the knife as she neared Ms. Chadwick. Unable to approach the two women because of a chain-link fence, defendant and UAPD Corporal Andrew Kisela shot Ms. Hughes four times.

Ms. Hughes brings suit under 42 U.S.C. § 1983 claiming excessive force in violation of her constitutional rights. The district court granted summary judgment in favor of Corporal Kisela, concluding that his actions were reasonable and that he was entitled to qualified immunity. The facts when viewed in the light most favorable to Ms. Hughes do not support the district court's decision. We reverse and remand for further proceedings.

## FACTUAL BACKGROUND

On May 21, 2010, Corporal Kisela and UAPD officer-in-training Alex Garcia were monitoring the Tucson Police Department radio when they heard a "check welfare" call regarding a woman reportedly hacking at a tree with a large knife. The officers drove to the location and were told by the reporting party that the person with the knife had been acting erratically. UAPD Officer Lindsay Kunz also responded to the call.

The following events occurred in less than one minute. Soon after the three officers arrived, Amy Hughes emerged from her house carrying a large kitchen knife. Sharon Chadwick was standing outside the house in the vicinity of the driveway. According to Ms. Chadwick's affidavit, Ms. Hughes was composed and content as she exited the house, holding the kitchen knife down to her side with the blade pointing backwards. Ms. Chadwick submits that she was never in fear, and did not feel that Ms. Hughes was a threat.

As Ms. Hughes approached Ms. Chadwick, the officers each drew their guns and ordered her to drop the knife. Although Corporal Kisela contends that the officers yelled numerous time for Ms. Hughes to drop the knife, Ms.

Chadwick recalls hearing only two commands in quick succession.  Ms. Hughes did not drop the knife and continued to move toward Ms. Chadwick.  Corporal Kisela recalls seeing Ms. Hughes raise the knife as if to attack.  Officers Garcia and Kunz later told investigators that they did not see Ms. Hughes raise the knife.

A chain link fence at the edge of the property prevented the officers from getting any closer to the two women. Because the top of the fence obstructed his aim, Corporal Kisela dropped down and fired four shots through the fence. Each of the shots struck Ms. Hughes, causing her to fall at Ms. Chadwick's feet.  Her injuries were not fatal.

In an interview with police after the shooting, Ms. Chadwick explained that she and Ms. Hughes lived together, and that she had managed Ms. Hughes's behavior in the past. She also informed police that Ms. Hughes had been diagnosed with bipolar disorder and was taking medication. Ms. Chadwick believes that Ms. Hughes did not understand what was happening when the police yelled for her to drop the knife.  She also believes that Ms. Hughes would have given her the knife if asked, and that the police should have afforded her that opportunity.

## STANDARD OF REVIEW

A district court's grant of a motion for summary judgment is reviewed de novo.  *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).  "Summary judgment is appropriate only 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'"  *Stoot v. City of Everett*,

582 F.3d 910, 918 (9th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). In reviewing a summary judgment ruling, we draw all reasonable inferences in favor of the non-moving party. *Galvin v. Hay*, 374 F.3d 739, 745 (9th Cir. 2004). We are obligated to construe the record in the light most favorable to the party opposing summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We review an officer's entitlement to qualified immunity de novo. *Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011).

## DISCUSSION

## I. Excessive Force

When evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Reasonableness therefore "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

The strength of the government's interest in the force used is evaluated by examining three primary factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Garner*, 471 U.S. at 8–9). The "'most important' factor under *Graham* is whether the suspect posed an 'immediate threat to the safety of officers or third parties.'" *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)).

The factors identified in *Graham* are not exclusive. *See Bryan*, 630 F.3d at 826. When assessing the officer's conduct, a court must examine "the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Id.* (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). Other relevant factors may include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officer that the subject of the force used was mentally disturbed. *See, e.g., Bryan*, 630 F.3d at 831; *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001). With respect to the possibility of less intrusive force, officers need not employ the least intrusive means available so long as they act within a range of reasonable conduct. *See Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

In this case, when viewing the facts in the light most favorable to Ms. Hughes, the record does not support Corporal Kisela's perception of an immediate threat. Officer Garcia told Tucson police that Ms. Hughes did not raise the knife and did not make any aggressive or threatening actions

toward Ms. Chadwick. Officer Kunz similarly did not see Ms. Hughes raise her arm. Ms. Chadwick describes Ms. Hughes as having been composed and non-threatening immediately prior to the shooting.[1]

Corporal Kisela was undoubtedly concerned for Ms. Chadwick's safety. He had received a report of a person with a knife acting erratically, and soon thereafter saw that same person still holding a knife and approaching another individual. In some situations, "[i]f the person is armed . . . a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *George*, 736 F.3d at 838. Nonetheless, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281 ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury."); *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."). Here, viewing those "objective factors" in a light most favorable to Ms. Hughes, a rational jury could find that she did not present an immediate threat to the safety of others, and that Corporal Kisela's response was unreasonable. *Id.*

---

[1] While Ms. Chadwick's description may not be entirely consistent with some of her other statements in the record, "we must draw all justifiable inferences in favor of [Ms. Hughes], including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 520 (1991).

The question of the severity of the crime being committed also weighs in Ms. Hughes's favor. The three officers present at the time of the shooting were responding to a "check welfare" call. No crime was reported. As in *Deorle*, where the police shot a mentally ill man acting strangely, the officers arrived "not to arrest [Ms. Hughes], but to investigate [her] peculiar behavior." 272 F.3d at 1280–81. And also as in *Deorle*, this was not a situation of a "lone police officer suddenly confronted by a dangerous armed felon . . . ." *Id.* at 1283. The majority in *Deorle* noted that "[t]he character of the offense is often an important consideration in determining whether the use of force was justified," and ultimately concluded that "where the crime being committed, if any, was minor and the danger to . . . others appear to have been minimal," the governmental interest in using force was "clearly not substantial." *Id.* at 1280–82. A rational jury, viewing the facts in a light most favorable to Ms. Hughes, could reach the same conclusion here.

The third factor cited in *Graham*, whether the suspect was resisting or seeking to evade arrest, does not apply as the events in this case occurred too quickly for the officers to make an arrest attempt. A related issue is Ms. Hughes's disregard of the officers' commands to drop the knife. It is undisputed that officers yelled at least twice for her to drop the knife. If the case goes to trial, the jury may hear evidence of several additional warnings. At summary judgment, however, the Chadwick affidavit plays an important role on this point. Ms. Chadwick heard only two warnings in quick succession, and perceived that Ms. Hughes did not understand what was happening. Whether the police should have perceived this is a question for the jury.

At the time, the police were privy to facts suggesting that Ms. Hughes might have a mental illness. The initial report was to "check welfare" of a person trying to cut down a tree with a knife. Upon arriving at the scene, the reporting party informed Corporal Kisela that this same person was acting erratically. Just prior to the shooting, Corporal Kisela himself recalled Ms. Hughes "stumbling" toward Ms. Chadwick.

This Court has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Bryan*, 630 F.3d at 829. The Court has, however, "found that even when an emotionally disturbed individual is acting out and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted . . . with a mentally ill individual." *Id.* (citation and internal quotation marks omitted). A reasonable jury could conclude, based upon the information available to Corporal Kisela at the time, that there were sufficient indications of mental illness to diminish the governmental interest in using deadly force.

Another factor to be considered is whether there were less intrusive means that could have been used before employing deadly force. As noted previously, officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Henrich*, 39 F.3d at 915. However, "police are 'required to consider [w]hat other tactics if any were available,'" and whether there are "clear, reasonable and less intrusive alternatives" to the force being contemplated. *Bryan*, 630 F.3d at 831 (quoting *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000)); *see also Smith v. City of Hemet*, 394 F.3d 689,

703 (9th Cir. 2005) (holding that officers should consider "alternative techniques available for subduing [a suspect] that presented a lesser threat of death or serious injury").

In this case, the record includes expert opinions about the reasonableness of using a firearm in this situation. Ms. Hughes's expert concluded that Corporal Kisela should have used his Taser, and that shooting through the fence was both dangerous and excessive. Corporal Kisela's expert opined that a Taser would likely have become tangled in the fence, and that the shooting was reasonable. It is well established that a jury may hear expert testimony in this type of case, and rely upon such evidence in assessing whether the officer's use of force was unreasonable. *See Larez v. City of Los Angeles*, 946 F.2d 630, 635 (9th Cir. 1991) (as amended) (finding that testimony of "an expert on proper police procedures and policies" was relevant and admissible). Here, the differences in the experts' opinions reinforce our conclusion that there are questions for a jury to consider in determining whether Ms. Hughes's constitutional rights were violated.

This Court has noted that "[b]ecause [the question of excessive force] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see also Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."). This is such a case. Material questions of fact, such as the severity of the threat, the adequacy of police warnings, and the potential for less intrusive means are plainly in dispute. *See, e.g.*, *City of*

*Hemet*, 394 F.3d at 703 ("Considering the severity and extent of the force used, the three basic *Graham* factors, and the availability of other means of accomplishing the arrest, it is evident that the question whether the force used here was reasonable is a matter that cannot be resolved in favor of the defendants on summary judgment."). Corporal Kisela is not entitled to summary judgment with respect to the reasonableness of his actions.

## II.  Qualified Immunity

The district court determined that because Corporal Kisela acted reasonably, it need not reach the question of qualified immunity.  Nonetheless, the court commented that "under the totality of the circumstances and the standard of whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted, it appears that [Corporal Kisela's] conduct was reasonable; [Corporal Kisela] would therefore be entitled to qualified immunity."  As discussed above, there are questions of fact in dispute that foreclose a finding of reasonableness as a matter of law.  We therefore undertake a qualified immunity analysis.

The Supreme Court has explained that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity shields an officer from liability even if his or her actions resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Groh v.*

*Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). The purpose of qualified immunity is to strike a balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. Al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citing *Pearson*, 555 U.S. at 232). Consequently, at summary judgment, an officer may be denied qualified immunity in a Section 1983 action "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

Here, the question of a constitutional violation involves disputed facts which, when viewed most favorably to Ms. Hughes, could support a rational jury finding in her favor. We therefore move to the second question: whether the right at issue was clearly established such that a reasonable officer

would have understood his actions were unlawful. The law does not "require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 740. That said, this Court has acknowledged that qualified immunity may be denied in novel circumstances. *See Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle*, 272 F.3d at 1286; *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (stating that "in an obvious case, these [*Graham*] standards can 'clearly establish' the answer, even without a body of relevant case law").

The most analogous Ninth Circuit case is *Glenn*, 673 F.3d 864, in which an eighteen-year-old man was shot in his driveway by police officers. Police received a report of an agitated, intoxicated man carrying a pocket knife and threatening to kill himself. Although at least one officer was told that the man had calmed down, when police saw him holding the knife to his own neck they drew their guns and screamed for him to drop it. Additional officers arrived at the scene, one of whom shot the man with several beanbags. The impact of the beanbags caused the man to move away from the beanbag fire and toward the house in which his parents were standing. As police had determined that if the man "made a move toward the house with his parents inside, they would use deadly force," they opened fire and killed him. *Glenn*, 673 F.3d at 869.

*Glenn* is similar to this case in several respects. For example: it was not clear that the decedent in *Glenn* was

actually threatening anyone; no serious crime was being committed; there was no effort to resist or evade arrest aside from failing to put down the knife; the failure to drop the knife may have been the result of confusion by an impaired person; and it might have been reasonable to use less intrusive force. Although the district court had granted summary judgment, this Court remanded *Glenn* for a jury trial. *Id.* at 879–80.

*Deorle*, 272 F.3d 1272, also offers similar facts, though the plaintiff in *Deorle* was acting far more strangely than Ms. Hughes. In *Deorle*, an officer responded to a call about an individual who was drunk and behaving erratically. At different points, the man brandished a hatchet, shouted "kill me," threatened to "kick [a police officer's] ass," and walked around with an unloaded cross-bow. 272 F.3d at 1276–77. Police observed him for five to ten minutes before the man began walking towards an officer with a bottle of lighter fluid. At that point the officer fired a bean bag, permanently blinding the man and fracturing his skull in several places. *Id.* at 1277–78.

As in this case, police in *Deorle* were at the scene to investigate peculiar behavior. Some sort of mental impairment was evident, the suspect was not trying to escape, and the risk of imminent harm was in question. In denying the officer's qualified immunity defense, this Court wrote:

> Every police officer should know that it is objectively unreasonable to shoot . . . an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force,

poses no risk of flight, and presents no
objectively reasonable threat to the safety of
the officer or other individuals.

*Id.* at 1285.

Here, several of those same determinations are in dispute,
namely: whether Corporal Kisela was reasonable in believing
that the kitchen knife was a weapon; whether he should have
suspected mental health issues; whether the warning was
sufficient; and most importantly, whether it was reasonable
to believe that Ms. Hughes presented a threat to Ms.
Chadwick's safety. If those questions are determined in Ms.
Hughes's favor, then Corporal Kisela clearly violated her
constitutional right.

Corporal Kisela claims support to the contrary from
*Blanford v. Sacramento County,* 406 F.3d 1110 (9th Cir.
2005), in which police had received reports of a man in a ski
mask carrying a sword through a suburban residential
neighborhood. But that case could not reasonably be relied
upon as justifying shooting Ms. Hughes. Mr. Blanford was
carrying a two-and-a-half-foot-long Civil War-era cavalry
saber and made "a loud growling or roaring sound."
*Blanford*, 406 F.3d at 1113. He then walked toward a
residence and tried to enter after searching his pockets for
keys. Unsuccessful, he turned to a walkway, saw the police
officers with guns drawn, and heard them order him to drop
the sword. The police shot the man as he rounded the far
corner of the house, then again as he tried to enter through
another door. After the man continued walking, police fired
a third time and severed his spine, rendering him a paraplegic.
On those facts, the Court found that the officers were entitled
to qualified immunity. *Id.* at 1119.

This case, when viewing the facts in Ms. Hughes's favor, differs from *Blanford* in several critical respects. Most importantly, in contrast to a clearly disturbed man carrying a sword, Ms. Hughes held a kitchen knife—which has a perfectly benign primary use—down at her side, and according to Ms. Chadwick's affidavit, did not appear either angry or menacing. The only information the police had regarding her use of the knife was that she was carving a tree, not that she was threatening or hurting a person. Mr. Blanford plainly disregarded police orders to drop the weapon. Here, it was apparent to Ms. Chadwick, and there is a fact issue whether it should have been evident to the police, that Ms. Hughes did not understand what was happening when they yelled for her to drop the knife. And in *Blanford* the suspect actively evaded police, while Ms. Hughes made no such attempt to get away.

The application of qualified immunity in this case will depend upon the facts as determined by a jury. The facts, viewed in Ms. Hughes's favor, present the police shooting a woman who was committing no crime and holding a kitchen knife. While the woman with the knife may have been acting erratically, was approaching a third party, and did not immediately comply with orders to drop the knife, a rational jury—again accepting the facts in the light most favorable to Ms. Hughes—could find that she had a constitutional right to walk down her driveway holding a knife without being shot. As indicated by *Glenn* and *Deorle*, as well as the Supreme Court's reference to the "obvious case," *Brosseau*, 543 U.S. at 199, that right was clearly established. Based on the disputed facts, Corporal Kisela is not entitled to qualified immunity.

## CONCLUSION

We therefore reverse the district court's grant of summary judgment and remand for a jury to determine whether Corporal Kisela's use of deadly force was lawful.

**REVERSED AND REMANDED**.