**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| S. B., a minor, individually and as Successor in Interest to David Lee Brown, deceased, by and through his Guardian Ad Litem, Angela Caruso; M. B., a minor, individually, by and through her Guardian Ad Litem, Angela Caruso; ANGELA CARUSO, *Plaintiffs-Appellees*,<br><br>v.<br><br>COUNTY OF SAN DIEGO, a municipal entity; ADRIAN MOSES, Deputy, *Defendants-Appellants*. | No. 15-56848<br><br>D.C. No. 3:14-cv-00072-JAH-WVG<br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued and Submitted February 17, 2017
Pasadena, California

Filed May 12, 2017

Before: Milan D. Smith, Jr. and John B. Owens, Circuit
Judges, and Edward R. Korman,[*] District Judge.

Opinion by Judge Owens

---

**SUMMARY**[**]

---

**Civil Rights**

The panel reversed the district court's order, on summary
judgment, denying qualified immunity to a San Diego
Sheriff's deputy, and remanded, in an action brought under
42 U.S.C. § 1983 alleging that the deputy used excessive
force when he shot and killed David Brown in his home.

The panel agreed with the district court that, reviewing
the facts in the light most favorable to plaintiffs, a reasonable
juror could find that the deputy's use of deadly force was not
objectively reasonable, and therefore that he violated
Brown's Fourth Amendment right against excessive force.
The panel disagreed, however, with the district court that it
was clearly established on August 24, 2013, that using
deadly force under the circumstances, even viewed in the
light most favorable to plaintiffs, would constitute excessive
force under the Fourth Amendment. The panel held that the
district court did not have the benefit of *White v. Pauly*, 137
S. Ct. 548, 551 (2017), and the cases that plaintiffs cited did

---

[*] The Honorable Edward R. Korman, United States District Judge
for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It
has been prepared by court staff for the convenience of the reader.

not satisfy *White's* exacting standard. Nor did the present case involve an "obvious" or "run-of-the-mill" violation of the Fourth Amendment under *Graham v. Connor*, 490 U.S. 386, 396–97 (1989), and *Tennessee v. Garner*, 471 U.S. 1 (1985). The panel therefore held that the deputy was immune from liability under section 1983 for his use of deadly force.

Because this was an interlocutory appeal, the panel did not address plaintiffs' claim for wrongful death under California law, but noted that its conclusion that deadly force was not objectively reasonable as a matter of law supported the district court's denial of summary judgment on plaintiffs' state law claim.

## COUNSEL

James Chapin (argued), Senior Deputy County Counsel; Thomas E. Montgomery, County Counsel; Office of County Counsel, San Diego, California; for Defendants-Appellants.

Megan R. Gyongyos (argued) and Bryan T. Dunn, The Cochran Firm California, Los Angeles, California, for Plaintiffs-Appellees.

**OPINION**

OWENS, Circuit Judge:

Defendants San Diego Sheriff's Deputy Adrian Moses and the County of San Diego (defendants) appeal interlocutorily from the district court's denial of qualified immunity. The heirs of David Brown (plaintiffs) sued defendants for shooting and killing Brown in his home. While we agree with the district court that plaintiffs established a triable issue as to the reasonableness of the shooting, we disagree about the application of qualified immunity. We therefore reverse.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. The Death of David Brown

On the early evening of August 24, 2013, Deputies Moses and Vories each overheard a "5150" radio call for a house in San Marcos, California.[1] The radio call stated that family members were concerned about their safety because an individual (Brown), who had mental health issues and was intoxicated, had been acting aggressively. The family members had left the house for a nearby fire station to report the situation.

At the fire station, the family told Moses and Vories that Brown was bipolar, schizophrenic, diabetic, and under the influence of Valium and alcohol. Brown had been "acting aggressively" all day, and had warned that "someone was

---

[1] 5150 is a well-recognized code for a person who is potentially a danger to themselves or others due to mental illness and/or being under the influence of alcohol or drugs.

gonna get hurt" if he did not get alcohol. Other than typical kitchen knives, Brown did not have access to any weapons (though in the past he had carried a pocket knife). The family did not know if Brown had any knives on his person that day.

Moses and Vories went to Brown's house, and Deputy Billieux met them there.[2] One of Brown's relatives, working on a car in the driveway, told the officers that Brown was inside the house, had been drinking and taking medications all day, and had been "acting strangely all day," "ranting and raving," and not making "sense." And, Brown "wouldn't be happy" if he knew the officers were there.

Moses and Vories then entered the front door of the house, and Billieux covered the door leading from the garage into the house. Moses had his gun drawn, and Vories had his Taser ready to go, so the officers had both non-lethal and lethal force options. The officers did not see Brown immediately, but heard cabinets or drawers opening and closing in the kitchen area. Moses then announced "Sheriff's Department" and called for Brown by name. A small wall separated the kitchen and living room, with open entryways on either side. Moses and Vories entered the kitchen from different sides of the wall. Moses told Brown that he wanted to speak with him.

After Moses and Vories rounded the dividing wall, they saw that Brown had kitchen knives sticking out of his pockets. Vories yelled "knife," radioed the same, drew his gun, and holstered his Taser. Appearing under the influence, Brown was staggering and stumbling over his words, had

---

[2] Billieux previously had worked with the Sheriff's Psychiatric Emergency Response Team, which responded to 5150 calls like this one.

difficulty standing up straight, was swaying side to side, and had a glassy eyed stare and could not focus on Moses.

Moses pointed his gun at Brown and ordered him to raise his hands, but Brown initially did not do so. Moses repeated the order, and Brown raised his hands to his shoulders. Brown asked Moses why he was pointing his gun at him, and Moses replied that Brown had knives on his person. Brown said he would put the knives on the table, but Moses told him not to do so. Brown was rambling a lot, repeating things like "Just shoot me" and "I can't bring him back. He's gone." Moses continued talking to Brown, and when Brown would drop his hands, Moses would tell Brown to raise them again. Vories heard Moses saying that "If you go for the knife, you will be shot." The officers ordered Brown to drop to his knees, and Brown complied.

The three officers' deposition testimony regarding the next moments before the shooting, summarized below, was consistent in many respects, but different in others.

***Moses***: Moses saw Vories standing to his left, about three to five feet from Brown. Once Brown was on his knees, Vories moved towards Brown to handcuff him. Brown looked at Vories, lowered his arm and pointed it at Vories, and said "Get the fuck away from me." Vories stepped back.

Brown then looked at Vories, "reached back with his right hand and produced a knife" with a six-to-eight-inch blade. Brown moved as if he were going to get up, and pointed the knife at Vories. Moses could see Vories clearly in his peripheral vision. Believing that Vories was in imminent danger, Moses shot Brown three or four times, less than one second after Brown grabbed the knife. About five

minutes elapsed between when Moses first saw the knife in Brown's pocket and the shooting.

*Vories*: After Brown kneeled, Vories holstered his gun and drew his Taser. Brown saw the Taser's red light on his body and said "I've been tased before. Just tase me." Vories stepped closer, and Brown began screaming and grabbing his face, and yelled something like "I can't handle it anymore." Brown then reached for the knife in his right back pocket. Moses said "Don't do it. Don't do it."

As Brown started to rise with the knife "in one fluid motion," Vories heard three to six shots come from Moses. Brown's knees were about an inch off the ground when he was shot, with his left hand on the floor and the knife in his right hand. Brown had made eye contact with Vories, and was in the process of standing up from his kneeling position. Moses shot Brown "almost instantaneous[ly]" as Brown grabbed the knife. "When his hand touched the knife, the first round came out."

When the shots were fired, Vories was switching from his Taser to his gun. Vories could not see Moses, and believed that the wall prevented Moses from seeing him. Brown was closer to Vories than Billieux when the shots were fired.

*Billieux*: After Brown got down on his knees, Billieux joined Vories so they could handcuff Brown while Moses kept his gun on Brown. Billieux told Brown to put his hands on his head, and he did.

When Billieux and Vories took a step closer to Brown, Brown "got quiet[,] . . . unclasped his fingers from his head[,] and started to slowly bring his hands back down." Billieux again told Brown to keep his hands on his head, and

she pulled Vories back to give Brown room. Vories was now six to eight feet from Brown.

Brown slowly lowered his hands about halfway, and then extremely quickly grabbed a knife from his right back pocket and held it in front of him. Brown was still on his knees, but started to move as if he were going to stand, and then Billieux heard three to six shots. She opined that Brown was trying to stab Vories, was close enough to do so, and that either she or Vories would have been stabbed had Moses not fired. She said that Vories was three to four feet away from Brown when Moses fired (though she did not know if Vories moved closer to Brown after she pulled him away). She could not see Moses when he fired the fatal shots.

## B.  District Court Proceedings

In January 2014, plaintiffs filed this action against defendants, which alleged: (1) a 42 U.S.C. § 1983 claim for excessive force in violation of the Fourth Amendment; and (2) wrongful death under California law. In August 2015, the district court held a hearing on defendants' motion for summary judgment. During the hearing, counsel for plaintiffs twice acknowledged that the case was "close," but urged the court to permit a jury to decide whether the officers were liable due to the inconsistencies in the officers' testimony.

The district court agreed, and specifically found three material inconsistencies that required a jury trial: (1) whether Brown was on his knees or attempting to stand when he grabbed the knife and was shot; (2) whether Moses could see the other officers clearly when he fired his weapon; and (3) the distance between Brown and Vories when Brown grabbed the knife. These same inconsistencies also created a triable dispute over whether Moses's conduct violated

clearly established law, so qualified immunity was not appropriate. The district court did not identify what clear precedent barred Moses from using deadly force under the circumstances, and did not discuss the standards set out in *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774–76 (2015).

Defendants then filed this timely interlocutory appeal over the denial of qualified immunity to Moses.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Glenn v. Washington County*, 673 F.3d 864, 870 (9th Cir. 2011). We also review de novo a defendant officer's entitlement to qualified immunity. *Id.*

## III. ANALYSIS

"In determining whether an officer is entitled to qualified immunity, we consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)). "While we have discretion to decide which prong to address first, here we address both." *Id.*

### A. Whether A Constitutional Right Was Violated

The Fourth Amendment permits law enforcement to use "objectively reasonable" force. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Factors for evaluating reasonableness include, but are not limited to: (1) the severity of the crime at issue; (2) whether the suspect posed

an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to escape. *Id.* at 396; *see also George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013) (discussing *Graham* and *Tennessee v. Garner*, 471 U.S. 1 (1985)). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed."[3] *Glenn*, 673 F.3d at 872. Of all these factors, the "most important" one is "whether the suspect posed an immediate threat to the safety of the officers or others." *George*, 736 F.3d at 838 (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotations omitted)).

We must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Nonetheless, summary judgment should be granted "sparingly" in excessive force cases, particularly "where the only witness other than the officers was killed during the encounter." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc)

---

[3] "Even when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

(citation omitted). "Because the person most likely to rebut the officers' version of events – the one killed – can't testify, [t]he judge must carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (citation and internal quotation marks omitted).

Reviewing the facts in the light most favorable to plaintiffs, *Glenn*, 673 F.3d at 870, we agree with the district court that a reasonable juror could find a Fourth Amendment violation. While the officers' testimony is consistent on many key points – Brown grabbed his knife despite orders to place his hands on his head – the officers' sworn testimony differs on other important facts. As the district court noted, there were discrepancies regarding: (1) whether Brown was on his knees or attempting to stand when he grabbed the knife and was shot; (2) whether Moses could see the other officers clearly when he fired his weapon; and (3) the distance between Brown and Vories when Brown grabbed the knife. The scope of our review on an interlocutory appeal from the denial of qualified immunity is limited to questions of law, and "[a]ny decision by the district court that the parties' evidence presents genuine issues of material fact is categorically unreviewable." *George*, 736 F.3d at 834 (citation and internal quotation marks omitted). Moreover, defendants ignore testimony in plaintiffs' favor in arguing that there were no discrepancies.

At this stage, "all justifiable inferences are to be drawn in [the plaintiffs'] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Here, a reasonable jury could conclude that: (1) the three officers, responding to a call about a mentally ill and intoxicated individual "acting aggressively," entered Brown's house and saw that he had

knives in his pockets; (2) after Brown complied with the officers' orders to kneel, Brown grabbed a knife with a six-to-eight-inch blade from his back pocket; (3) Moses shot Brown as soon as his hand touched the knife; (4) Brown was on his knees when he was shot; (5) when he grabbed the knife, Brown was approximately six to eight feet away from Vories; (6) Moses could not see the other officers at the time Brown grabbed the knife; (7) after Brown went for the knife, the officers did not order him to drop the knife or warn that he was about to be shot; and (8) Vories had a non-lethal option – a Taser gun. Viewing the facts in this light, Moses's use of deadly force was not objectively reasonable, and therefore violated Brown's Fourth Amendment right against excessive force. Our holding mirrors those in similar cases.[4]

## B. Whether The Constitutional Right Was Clearly Established

But that is not all. Under the second prong of the qualified immunity test, we decide if the alleged violation of Brown's Fourth Amendment right against excessive force

---

[4] *See, e.g.*, *Hughes v. Kisela*, 841 F.3d 1081, 1085–87 (9th Cir. 2016) (reversing grant of summary judgment on excessive force claim where an officer shot, but did not kill, an emotionally disturbed individual holding a large kitchen knife in her driveway after she walked toward another woman and did not comply with orders to drop the knife); *Glenn*, 673 F.3d at 871–78 (reversing grant of summary judgment on excessive force claim where officers shot and killed an emotionally disturbed and intoxicated individual who did not comply with orders to put down a pocketknife for approximately three minutes); *see also Hayes v. County of San Diego*, 736 F.3d 1223, 1227–28, 1233–35 (9th Cir. 2013) (reversing grant of summary judgment on California wrongful death claim, which uses same standard as Fourth Amendment, where officers shot and killed an emotionally disturbed individual inside his home who held a large knife pointed downward and took one to two steps toward an officer but was still six to eight feet away).

"was clearly established at the time of the officer's alleged misconduct." *C.V.*, 823 F.3d at 1255 (quoting *Lal*, 746 F.3d at 1116). If not, the officer receives qualified immunity. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Further, the clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," especially in the Fourth Amendment context, where "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id*. (citations and internal quotation marks omitted). Put another way, only the "plainly incompetent" officer will not enjoy qualified immunity. *Id.* (citation omitted).

In analyzing this question, we acknowledge the Supreme Court's recent frustration with failures to heed its holdings. The Supreme Court has "repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality." *Sheehan*, 135 S. Ct. at 1775–76 (citation omitted). Our court lacks a monopoly over such immunity missteps. When recently reversing the Tenth Circuit, the Supreme Court wrote: "In the last five years, [the Supreme Court] has issued a number of opinions reversing federal courts in qualified immunity cases." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (citing *Sheehan*, 135 S. Ct. at 1774 n.3 (collecting cases)). "The Court has found this necessary both because qualified

immunity is important to 'society as a whole,' and because as 'an immunity from suit,' qualified immunity 'is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* (citations omitted).

We hear the Supreme Court loud and clear. Before a court can impose liability on Moses, we must identify precedent as of August 24, 2013 – the night of the shooting – that put Moses on clear notice that using deadly force in these particular circumstances would be excessive. General excessive force principles, as set forth in *Graham* and *Garner*, are "not inherently incapable of giving fair and clear warning to officers," but they "do not by themselves create clearly established law outside an obvious case." *Id.* at 552 (citations and internal quotation marks omitted). Instead, we must "identify a case where an officer acting under similar circumstances as [Moses] was held to have violated the Fourth Amendment." *Id.* We cannot locate any such precedent.

Our most similar case which pre-dates Moses's use of deadly force is *Glenn*, where officers fatally shot a suicidal and intoxicated individual in his driveway who did not comply with orders to put down a pocketknife. *See* 673 F.3d at 867–69. But in *Glenn*, the individual "did not brandish [the pocketknife] at anyone, but rather held [it] to his own neck." *Id.* at 873. Brown's grabbing the knife from his pocket despite orders to place his hands on his head was more threatening. *See George*, 736 F.3d at 838 (stating that while "the fact that the suspect was armed with a deadly weapon does *not* render the officers' response per se reasonable under the Fourth Amendment, . . . [i]f the person is armed . . . [then] a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat" (citation and internal quotation marks omitted)). As such,

the facts of *Glenn* are not sufficiently analogous to give Moses fair notice that it was objectively unreasonable to use lethal force against Brown.[5]

Plaintiffs argue that two district court decisions (within the Ninth Circuit but outside of California) provided clear warning to Moses.  However, "district court decisions – unlike those from the courts of appeals – do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity." *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016) (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)).  Moreover, even if district court decisions could clearly establish the law for purposes of qualified immunity, the cases on which plaintiffs rely are insufficient. *Herrera* is distinguishable because, viewing the evidence in the plaintiffs' favor, officers fatally shot an emotionally disturbed individual who "was merely standing with the knife pointed skyward, stunned, for nearly a full minute." *Herrera v. Las Vegas Metro. Police Dep't*, 298 F. Supp. 2d 1043, 1050 (D. Nev. 2004).  And *Davis* is distinguishable because, viewing the evidence in the plaintiff's favor, the emotionally disturbed plaintiff was

---

[5] Our decision in *Deorle* is also not sufficiently analogous because that emotionally disturbed individual was unarmed at the time an officer shot him in the face with a beanbag gun. *See* 272 F.3d at 1275; *see also Sheehan*, 135 S. Ct. at 1776 (stating that *Deorle* was distinguishable because, among other reasons, it involved an unarmed individual).  We recognize that in *Hughes*, which like here involved an emotionally disturbed individual with a kitchen knife, we relied on *Deorle* as supporting a clearly established right. *See Hughes*, 841 F.3d at 1089–90.  However, unlike here, in *Hughes* it was disputed whether the officer "was reasonable in believing that the kitchen knife," – "which has a perfectly benign primary use" and was being held "down at her side" – "was a weapon." *Id*. at 1089–90.

holding the knife downward when he was shot, and the officer shot him in the back after he had fallen to the ground. *Davis v. Clark*, No. CV07-435-S-EJL, 2010 WL 679037, at *9 (D. Idaho Feb. 23, 2010). Here, as noted, Brown's actions were more threatening because he grabbed a knife from his pocket.

We disagree with the district court that it was clearly established on August 24, 2013, that using deadly force in this situation, even viewed in the light most favorable to plaintiffs, would constitute excessive force under the Fourth Amendment.**[6]** The district court did not have the benefit of *White*, and the cases that plaintiffs cite do not satisfy *White*'s exacting standard. Nor does this case involve an "obvious" or "run-of-the-mill" violation of the Fourth Amendment under *Graham* and *Garner*. *White*, 137 S. Ct. at 552. Moses is therefore immune from liability under section 1983 for his

---

**[6]** *Cf. Brosseau v. Haugen*, 543 U.S. 194, 200–01 (2004) (per curiam) (holding that officer was entitled to qualified immunity where the cases relied on by plaintiffs did not "squarely govern[]" the constitutionality of shooting a "disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area [were] at risk from that flight"); *C.V.*, 823 F.3d at 1257 (holding that officer was entitled to qualified immunity because it was not "clearly established" that use of deadly force violated the Fourth Amendment, even though there was a triable dispute whether the deadly force in fact violated the Fourth Amendment); *Blanford v. Sacramento County*, 406 F.3d 1110, 1119 (9th Cir. 2005) (holding that officers were entitled to qualified immunity because they "would not have found fair warning in *Garner*, *Graham*, or any other Supreme Court or circuit precedent at the time that they could not use deadly force to prevent someone with an edged sword, which they had repeatedly commanded him to drop and whom they had repeatedly warned would otherwise be shot, from accessing a private residence where they or people in the house or yard might be seriously harmed").

use of deadly force, so we reverse the denial of summary judgment on the Fourth Amendment claim.[7]

### REVERSED AND REMANDED.

The parties shall bear their own costs on appeal.

---

[7] Because this interlocutory appeal concerns only the denial of qualified immunity on plaintiffs' Fourth Amendment claim, we do not address plaintiffs' claim for wrongful death under California law. However, our conclusion that deadly force was not objectively reasonable as a matter of law supports the district court's denial of summary judgment on plaintiffs' state law claim. *See Hayes*, 736 F.3d at 1232, 1235–36 (stating that "[c]laims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims," but noting that under California law an officer's duty of reasonable care extends to his pre-shooting conduct); *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013) ("[T]he doctrine of qualified immunity does not shield defendants from state law claims.").