**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FERMIN VINCENT VALENZUELA; et al.,

Plaintiffs-Appellees,

v.

CITY OF ANAHEIM; et al.,

Defendants-Appellants.

No.    20-55372

D.C. Nos.
8:17-cv-00278-CJC-DFM
8:17-cv-02094-CJC-DFM

MEMORANDUM*

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted May 5, 2021
Pasadena, California

Before:  OWENS and LEE, Circuit Judges, and SIMON,** District Judge.
Dissent by Judge LEE

The City of Anaheim and individual officers ("Defendants") appeal from the

district court's denial of their post-trial motions after a jury found them liable for

the death of Fermin Valenzuela, Jr.  The district court denied qualified immunity

---

*      This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

**      The Honorable Michael H. Simon, United States District Judge for the
District of Oregon, sitting by designation.

and upheld the jury's finding that the officers used excessive force and violated California's Tom Bane Civil Rights Act ("Bane Act"), and that the City was liable under *Monell*.[1]  As the parties are familiar with the facts, we do not recount them here.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

**1. Qualified Immunity**

When considering whether an officer is entitled to qualified immunity for a 42 U.S.C. § 1983 claim, we assess "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct."  *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) (citation omitted).

Substantial evidence supports the jury's finding of excessive force in violation of Valenzuela's Fourth Amendment rights.  For excessive force claims, we evaluate: (1) "the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion . . . and the government's need."  *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (internal quotations and citation omitted).  When considering the government's interest, we assess "how severe the crime at issue was," "whether the suspect was actively resisting arrest or attempting to evade," and, most

---

[1] The district court also upheld the jury's $3.6 million award for Valenzuela's "loss of life."  We resolve the damages issue in a concurrently filed opinion.

2

importantly, "whether the suspect posed an immediate threat to the safety of the officers or others." *Id.* "Because this appeal comes after the jury's verdict, we must construe the facts in the light most favorable to the jury's verdict"—in this case, in favor of the Plaintiffs. *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1115 (9th Cir. 2017) (internal quotations and citation omitted).

Here, Anaheim police officers kept Valenzuela in multiple, extended choke holds even as he gagged, wheezed, turned purple, and screamed that he could not breathe—behavior we have previously identified as "severe" force "capable of causing death or serious injury." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (describing officers' "press[ing] their weight on [the suspect's] neck and torso as he lay handcuffed on the ground and begged for air"). The officers did so even though the City's interest in such force was low: Valenzuela was not suspected of a serious crime, he was half-naked and visibly unarmed, and he was at times subdued, with two officers holding down his arms as the third kept him in a choke hold. Moreover, the officers placed Valenzuela in the restraint more times—and kept him there for longer—than their training permitted. *See id.*, 343 F.3d at 1059 ("[W]e may certainly consider a police department's own guidelines when evaluating whether a particular use of force is constitutionally unreasonable."). Ample evidence thus supports the jury's

3

finding.[2]

For the second prong, at the time of Valenzuela's encounter with officers on July 2, 2016, any reasonable officer would have been on "clear notice that using deadly force in these particular circumstances would be excessive." *S.B.*, 864 F.3d at 1015. In 2003, we held that "squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Drummond*, 343 F.3d at 1059. And in 2013, we reaffirmed our prior conclusion, from 2009, that "it violate[s] clearly established law to use a choke hold on a non-resisting arrestee who had surrendered, pepper-spray him, and apply [severe] knee pressure on his neck and back." *Barnard v. Theobald*, 721 F.3d 1069, 1073, 1076 (9th Cir. 2013). Recently, we cited both *Drummond* and *Barnard* to deny qualified immunity to officers who "seize[d] a non-resisting, restrained person by placing him in a chokehold." *Tuuamalemalo v. Greene*, 946 F.3d 471, 479 (9th Cir. 2019) (per curiam).

Both the Defendants and dissent attempt to distinguish the above cases based on Valenzuela's resistance. But they ignore the fact that by the time of the final hold, Valenzuela was subdued: He was lying on the ground with his arms pinned down by two officers, and he was *kept* in the choke hold for at least one minute

---

[2] The Defendants' reliance on *Gregory v. County of Maui*, 523 F.3d 1103, 1108-09 (9th Cir. 2008) is unpersuasive, as the suspect in *Gregory* was armed, acting aggressively, and had already assaulted a third party.

despite the arm restraints.  *See LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) ("[I]n a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a *continued* use of [force] . . . constitutes excessive force." (emphasis added)); *see also Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241-42 (2021) (per curiam) (rejecting any per se rule permitting officers to use a "prone restraint . . . so long as an individual appears to resist officers' efforts to subdue him").  In addition, none of the cases the Defendants cite regarding active resistance involve neck restraints or a similar use of force, and none resulted in the suspect's death.  *See Shafer*, 868 F.3d at 1116 (leg sweep); *Emmons v. City of Escondido*, 921 F.3d 1172 (9th Cir. 2019) (per curiam) (tackling suspect); and *Gravelet-Blondin v. Shelton*, 728 F.3d 1086 (9th Cir. 2013) (stun gun).

Finally, to the extent that training materials are also relevant to the inquiry, *see Vazquez v. County of Kern*, 949 F.3d 1153, 1164-65 (9th Cir. 2020), the officers in this case were trained not to apply the carotid hold for longer than 30 seconds or attempt the hold more than twice within 24 hours, and they knew that an improper hold could lead to asphyxia or death.  Nonetheless, they placed Valenzuela in three separate, extended holds within a 10-minute period.  *See Drummond*, 343 F.3d at 1059 (describing the officers' use of the choke hold as "even more striking" in light of specific warnings of the "extreme danger" of

5

compression asphyxia).

## 2. *Monell* Liability

To hold a city liable under § 1983 for an official policy, a plaintiff must show that the city's "policy or custom" led to his injury. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A city's policy "'causes' an injury where it is 'the moving force' behind the constitutional violation.'" *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994) (citation omitted). Substantial evidence supports the jury's finding of *Monell* liability against the City.

The Anaheim Police Department had a policy of permitting carotid holds against resisting suspects. Here, it is uncontested that the officers were allowed under department regulations to place Valenzuela in a carotid hold. Indeed, the supervisory officer at the scene testified that he instructed his subordinate to "hold that choke" because he saw Valenzuela was resisting, and he knew it was "clearly" within department policy that "when a person is physically resisting," the officer may use the carotid hold.

The Defendants do not meaningfully challenge causation. Instead, they argue that the Plaintiffs did not show the policy was facially unconstitutional. But "[c]ity policy need only cause [the] constitutional violation; it need not be unconstitutional per se." *Chew*, 27 F.3d at 1444 (second alteration in original)

6

(internal quotations and citation omitted). The Defendants also argue that the Plaintiffs were required to show the City was "deliberately indifferent" in maintaining such a policy. But the Defendants never objected to the jury instructions before the district court, and they do not challenge the instructions on appeal. Thus, their argument is waived. *See Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995) ("[A] federal appellate court does not consider an issue not passed upon below." (citation omitted)).

### 3. Bane Act

California's Bane Act, codified as Cal. Civ. Code § 52.1, requires plaintiffs to demonstrate "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citation omitted). Substantial evidence supports the jury's finding of liability under the Bane Act.

All three officers knew the carotid hold could cause serious injury or death, and all three were aware of the department's limits on its use. Nonetheless, they applied multiple, extended holds against Valenzuela, even while he was lying down and restrained. The Defendants' argument that the verdict on the Bane Act is inconsistent with the jury's finding of no liability under the Fourteenth Amendment is wrong and based on the unsupported assumption that liability under both requires the same showing of specific intent.

7

**AFFIRMED.**

FILED

AUG 3 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

LEE, Circuit Judge, dissenting:

Tragically, a routine police stop spiraled out of control and led to the death of Fermin Valenzuela, Jr. Acting on a woman's complaint about a man following her, two Anaheim police officers approached Valenzuela in a laundromat. After noticing what looked like a methamphetamine pipe on the floor and witnessing Valenzuela put a screwdriver in his bag, one of the officers asked him to put his hands behind his back. He did not comply. Then one officer grabbed Valenzuela's arm and tried to put it behind his back.

In the ensuing struggle, all three men fell to the ground, and the two officers tried to restrain Valenzuela for the next two minutes. At least 40 times, the officers directed Valenzuela to stop resisting — to no avail. One of the officers put him in a neck restraint, causing a distressed Valenzuela to say that he could not breathe.

Despite two officers' attempts to restrain him, Valenzuela managed to slip away and fled the laundromat. One of the officers tased him multiple times, but Valenzuela, now shirtless and his pants nearly falling off, kept on running. He sprinted across several lanes of traffic but tripped on a curb in a parking lot. One of the officers straddled Valenzuela and tried to roll him onto his stomach but Valenzuela resisted. The officer then, yet again, put Valenzuela in a neck restraint, who visibly struggled to breathe and complained about it. Two more officers

arrived, and each grabbed one of Valenzuela's arms. Over the next minute and forty-five seconds, the officers ordered Valenzuela six times to stop resisting as they struggled to handcuff him. Once the other two officers finally managed to put handcuffs on Valenzuela, the officer who had him in the neck restraint released him immediately. Sadly, Valenzuela lost consciousness. The officers administered CPR, but Valenzuela died eight days later in a hospital.

I agree with the majority that the police officers used excessive force. But that does not end our inquiry. Under the Supreme Court's qualified immunity doctrine, a police officer may have violated someone's constitutional right but he or she may still have immunity if that right was not "clearly established at the time of the officer's alleged misconduct." *S.B. v. County of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017). And in this case, that right was not clearly established under our court's precedent as of July 2, 2016 when this tragic event occurred. I thus respectfully dissent.

*   *   *   *

Like many qualified immunity cases, this appeal turns on the second prong of the test: Was Valenzuela's constitutional right to be free from a neck restraint under these facts "clearly established" as of July 2, 2016? Put another way, we must ask whether a reasonable officer would have been on "clear notice that using [the particular] force in these particular circumstances would be excessive." *S.B.*, 864

2

F.3d at 1015-16. This is a very high bar: "To be clearly established, a right must be sufficiently clear that *every* reasonable official would have understood *what he is doing* violates that right." *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016) (emphasis in original).[1] So, in most cases, "officers are entitled to qualified immunity unless existing precedent 'squarely governs' the *specific facts at issue.*" *Kisela v. Hughes*, __ U.S. __, 138 S. Ct. 1148, 1153 (2018) (emphasis added).

Although we "do not require a case directly on point," existing precedent "must have placed the statutory or constitutional question *beyond debate*." *Hamby*, 821 F.3d at 1015 (internal quotation marks and citations omitted) (emphasis added). As the Supreme Court recently reminded us while reversing this court 9-0, factually analogous case law is "especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how relevant the legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *City of Escondido v. Emmons*, 139 S. Ct.

---

[1] Scholars, judges, and even Supreme Court Justices have raised significant questions about the basis for our qualified immunity framework. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring) ("The Civil Rights Act of 1871 . . . made no mention of defenses or immunities . . . Because our analysis is no longer grounded in the common-law backdrop against which Congress enacted the 1871 Act . . . our qualified immunity precedents . . . represent precisely the sort of 'freewheeling policy choices' that we have previously disclaimed the power to make") (cleaned up). *See also generally* William Baude, "Is Qualified Immunity Unlawful?" University of Chicago Public Law & Legal Theory Paper Series, No. 610 (2017). But unless the Supreme Court modifies this framework, we must follow it.

500, 503 (2019) (citing *Kisela*, 138 S. Ct. at 1153). Indeed, the use of "excessive force is an area of law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id.* Importantly, "[p]recedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force.'" *Kisela*, 138 S. Ct. at 1153 (citing *Mullenix*, 136 S. Ct. at 309, 312).

Valenzuela has not pointed to a single pre-July 2, 2016 single case that "'squarely governs' the specific facts at issue" — *i.e.*, whether the use of a neck restraint is unlawful when a suspect actively resists arrest. *Kisela*, 138 S. Ct. at 1153. In all the cases cited by the majority, the suspect already had been restrained or had surrendered when the officers used a chokehold or similar restraint. For example, in *Drummond ex rel. Drumond v. City of Anaheim*, we held that officers used excessive force by "press[ing] their weight on [the suspect's] neck and torso as he lay *handcuffed* on the ground." 343 F.3d 1052, 1056 (9th Cir. 2003) (emphasis added). In *Barnard v. Theobald*, we recognized that the use of a chokehold on "a *non-resisting* arrestee who had *surrendered*" violates the Fourth Amendment. 721 F.3d 1069, 1073, 1076 (9th Cir. 2013) (emphasis added). And *Tuuamalemalo v. Greene* involved yet again a "*non-resisting*" defendant. 946 F.3d 471, 479 (9th Cir. 2019) (per curiam) (emphasis added).

4

In contrast here, Valenzuela had neither surrendered nor was he handcuffed. Instead, he did not comply with the officers' orders and vigorously resisted being handcuffed or restrained. The video evidence reveals that officers immediately de-escalated and removed pressure from Valenzeula's chest and neck after handcuffing him.

The majority opinion argues that the officers kept him in a neck restraint for at least a minute after he was "already lying on the ground with his arms restrained by two officers during the final hold." But we cannot isolate the final minute of the encounter from the four preceding it. In those four minutes, Valenzuela repeatedly refused to comply with officers' requests to stand down, managed to escape from two officers who were trying to hold him down, did not stop after being repeatedly tased, and dragged officers on a chase across a busy street. Notably, he resisted and escaped from multiple attempted neck restraints involving several officers and withstood several taser shocks. Given that backdrop, one of the officers continued to hold Valenzuela in a neck restraint while his two colleagues tried to handcuff him. And the moment they managed to put handcuffs on him, the officers released him.

To be clear, none of these facts justify the police officers' excessive force. Valenzuela, a father of two, should not have died that day. Qualified immunity may sometimes lead to seemingly unjust results, but we are bound to follow it. And under our qualified immunity doctrine, we need to determine whether a right was "clearly

5

established" at that time such that a prior case "'squarely governs' the specific facts at issue" in this case. *Kisela*, 138 S. Ct. at 1153. And here, there was no prior case "squarely govern[ing]" the officers' conduct as of July 2, 2016. *Id.* I thus must respectfully dissent.