**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| S.R. NEHAD; K.R. NEHAD; ESTATE OF FRIDOON RAWSHAN NEHAD, *Plaintiffs-Appellants*, <br><br> v. <br><br> NEAL N. BROWDER; CITY OF SAN DIEGO; SHELLEY ZIMMERMAN, in her personal and official capacity as Chief of Police, *Defendants-Appellees*. | No. 18-55035 <br><br> D.C. No. 3:15-cv-01386-WQH-NLS <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted February 27, 2019
Southwestern Law School Los Angeles, California

Filed July 11, 2019

Before: Sidney R. Thomas, Chief Judge, Michael Daly
Hawkins, Circuit Judge, and Dean D. Pregerson,[*]
District Judge.

Opinion by Judge Pregerson

---

[*] The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

# SUMMARY[**]

## Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in favor of defendants and remanded in an action alleging that a City of San Diego police officer used excessive deadly force when he shot and killed Fridoon Nehad.

The panel held that there were several genuine disputes of material fact regarding plaintiffs' Fourth Amendment claim. At a broad level, the panel held that a triable issue remained regarding the reasonableness of the police officer's use of deadly force. More specifically, there were genuine disputes about: (1) the officer's credibility; (2) whether Nehad posed a significant, if any, danger to anyone; (3) whether the severity of Nehad's alleged crime warranted the use of deadly force; (4) whether the officer gave or Nehad resisted any commands; (5) the significance of the officer's failure to identify himself as a police officer or warn Nehad of the impending use of force; and (6) the availability of less intrusive means of subduing Nehad.

The panel further held that disputed factual questions also precluded a grant of summary judgment on qualified immunity grounds, as it was well-established at the time of the shooting that the use of deadly force under the circumstances in this case, viewed in the light most favorable to plaintiffs, was objectively unreasonable.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that plaintiffs presented sufficient evidence of police department customs, practices, and supervisory conduct to support a finding of entity and supervisory liability. Furthermore, the district court never afforded plaintiffs an opportunity to be heard before granting summary judgment on the negligence and wrongful death claims sua sponte. The panel therefore reversed the grant of summary judgment in favor of defendants on plaintiffs' Fourth Amendment and state law claims.

The panel affirmed the grant of summary judgment in favor of defendants on plaintiffs' claim for violation of their Fourteenth Amendment interest in the companionship of their child. The panel held that the police officer's use of force, even if unreasonable, did not evidence a subjective purpose to harm.

**COUNSEL**

Daniel S. Miller (argued), Sean G. McKissick, J. Mira Hashmall, and Louis R. Miller, Miller Barondess LLP, Los Angeles, California, for Plaintiffs-Appellants.

George Frederick Schaefer (argued), Assistant City Attorney; Kathy J. Steinman, Deputy City Attorney; Mara W. Elliott, City Attorney; Office of the City Attorney, San Diego, California; for Defendants-Appellees.

Scott J. Street, Baute Crochetiere & Hartley LLP, Los Angeles, California; Brian Hardingham, Public Justice P.C., Oakland, California; Adrienna Wong and Peter Bibring, ACLU Foundation of Southern California, Los Angeles, California; for Amici Curiae American Civil Liberties Union

of Northern California, American Civil Liberties Union of Southern California, American Civil Liberties Union of San Diego & Imperial Counties, and Public Justice.

Lee H. Roistacher, Daley & Heft LLP, Solana Beach, California, for Amici Curiae California State Association of Counties, League of California Cities, and International Municipal Lawyers Association.

**OPINION**

PREGERSON, District Judge:

On April 30, 2015, Officer Neal Browder of the San Diego Police Department responded to a 911 call about a man making threats with a knife. Browder arrived at the scene, where he encountered Fridoon Nehad walking at a steady pace in Browder's direction. The subsequent series of events, which is in dispute, culminated in Browder exiting his vehicle and, less than five seconds later, fatally shooting Nehad.

Appellants brought Fourth Amendment, Fourteenth Amendment, and state law claims against Browder, San Diego Chief of Police Shelley Zimmerman, and the City of San Diego. The district court granted summary judgment to Appellees on all claims.

We have jurisdiction under 28 U.S.C. § 1291. Reviewing the district court's grant of summary judgment de novo, we affirm with respect to Appellants' Fourteenth Amendment claim, reverse with respect to all other claims, and remand.

**FACTUAL AND PROCEDURAL BACKGROUND**

Shortly after midnight on April 30, 2015, Andrew Yoon encountered Fridoon Nehad outside the bookstore where Yoon worked. Nehad showed Yoon an unsheathed knife and said that he wanted to hurt people. Nehad was incoherent and "didn't seem like he knew what was going on[,]" so Yoon returned to work inside the store. A few minutes later, Nehad entered the store without a knife in hand, again said he wanted to harm people, then left the store via a side door into an adjoining alley. Yoon called 911 and told the emergency dispatcher that Nehad had threatened him with a knife.

Around 12:06 a.m., the police dispatcher put out a "Priority 1" call for a "417 (Threatening w[ith] weapon)," and indicated that a male in a back lot was threatening people with a knife.[1] San Diego Police Department Officer Neal Browder volunteered to respond to the call and drove to the scene in his police cruiser.

Surveillance camera footage shows that Nehad was walking down the alley behind the bookstore toward the street before Browder arrived. Browder turned his car from the street into the alley and turned on his car's high headlight beams. Browder did not activate his car's siren or police lights. Browder saw two people in a parking lot adjoining the alley and, soon after turning into the alley from the street, saw Nehad in the alley. Browder confirmed with dispatch that

---

[1] California Penal Code § 417 provides that anyone who draws or exhibits a deadly weapon, other than a firearm, "in a rude, angry, or threatening manner" is guilty of a misdemeanor. Cal. Pen. Code § 417(a)(1).

Nehad matched the description of the person brandishing a knife.

Once in the alley, Browder brought his vehicle to a halt and opened the driver's side door. Nehad continued to walk down the alley toward Browder and the street. Browder's vehicle advanced a short distance with the driver's door open before again coming to a stop. Nehad continued to walk toward Browder at a steady pace. Browder did not hear Nehad say anything, and did not see Nehad change his pace or make any sudden movements. Approximately twenty-eight seconds after pulling into the alley and eighteen seconds after opening his car door, Browder exited his vehicle. Browder did not activate his body camera.

Eyewitness accounts of what happened next differ. One witness, Andre Nelson, testified that Nehad was stumbling forward at a "drunken pace" in a nonagressive manner, "like he wasn't all there," while "fiddling with something in his midsection." Nelson could not recall Browder audibly identifying himself as a police officer, giving any type of warning, or saying anything at all. Nelson did recall Browder extending his left hand in a "stop" motion. No such motion is clearly visible on the surveillance video. Another witness, Albert Gallindo, testified that he heard Browder say, "Stop, drop it" two or three times.[2] Yoon, who was still on the phone with the emergency dispatcher when Browder arrived, recalled hearing Browder say "Stop, drop it" one time, no more than a "couple seconds" after Browder got out of the police car. Browder did not recall identifying himself or

---

[2] Gallindo also testified that Browder said, "Throw it down. Throw it down." It is unclear, however, whether Gallindo meant that Browder gave that command in addition to or as a variant of, "Stop, drop it."

saying anything to Nehad.  Video surveillance shows Nehad slowed down a few moments after Browder exited his vehicle, although it is unclear whether Browder perceived or could have perceived Nehad's change of pace.

Less than five seconds after exiting his vehicle, Browder fired a single shot at Nehad, fatally striking him in the chest. Nehad was approximately seventeen feet away at the time Browder shot him.

A few hours later, after police investigators arrived at the scene, they asked Browder whether he saw any weapons and where in the alley they might be.  Browder told the investigators that he had not seen any weapons.  Browder's attorney would not allow investigators to ask Browder any more questions that night.  The investigators did not find any weapons in the alley, and determined that Nehad had been carrying a metallic blue pen when Browder shot him.[3]

On May 5, five days after the shooting, Browder and his attorney met with homicide investigators at a police station. Police officials provided Browder and his attorney with surveillance video of the shooting, which Browder and his attorney reviewed in a police lieutenant's office for approximately twenty minutes before an interview commenced.  During the interview, Browder stated that he first saw Nehad when Nehad was twenty-five to thirty feet from Browder's car and that Nehad was "aggressing" the car and "walking at a fast pace . . . right towards [the] car." Browder also stated, for the first time, that he had thought Nehad was carrying a knife, and that he had fired on Nehad because he thought Nehad was going to stab him.

---

[3] Investigators did find a knife sheath in the alley.

Appellants, Nehad's parents and estate, filed suit against Browder, the City of San Diego, and San Diego Chief of Police Shelley Zimmerman (collectively, "Appellees"). In the operative Second Amended Complaint ("SAC"), Appellants allege 42 U.S.C. § 1983 claims for Fourth and Fourteenth Amendment violations and *Monell* and supervisory liability, two civil rights claims under state statutes, and common law claims for assault and battery, negligence, and wrongful death. Appellees filed a motion for summary judgment on seven of the nine claims, excluding the SAC's common law claims for negligence and wrongful death.

The district court granted Appellees' motion. The court granted summary judgment on Appellants' Fourth Amendment claim because, according to the district court, Browder's use of force was objectively reasonable. The court granted summary judgment on Nehad's parents' Fourteenth Amendment claim because there was no evidence that Browder acted with a purpose to harm unrelated to legitimate law enforcement objectives. The court further concluded that Browder was entitled to qualified immunity because there was no clear precedent establishing that Browder's use of deadly force would be considered excessive. The court also, in light of its determination that no constitutional violation had occurred, dismissed the *Monell* and supervisory liability claims against all Appellees. Lastly, the court concluded that, because Browder's use of force was objectively reasonable, Appellees were entitled to summary judgment on "all" state law claims.

Appellants now appeal the district court's grant of summary judgment.

**STANDARD OF REVIEW**

We review de novo a grant of summary judgment to determine whether "a rational trier of fact might resolve the issue in favor of the nonmoving party." *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007). In so doing, we view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Id.* We also review de novo a district court's grant of summary judgment on qualified immunity grounds. *Id.*

**ANALYSIS**

A. *Whether a Jury Could Conclude that Browder's Use of Force Was Unreasonable*

In Fourth Amendment excessive force cases, we examine whether police officers' actions are objectively reasonable given the totality of the circumstances. *Byrd v. Phoenix Police Dep't*, 885 F.3d 639, 642 (9th Cir. 2018); *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010). Our analysis must balance the nature of the intrusion upon an individual's rights against the countervailing government interests at stake, without regard for the officers' underlying intent or motivations. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Whether a use of force was reasonable will depend on the facts of the particular case, including, but not limited to, whether the suspect posed an immediate threat to anyone, whether the suspect resisted or attempted to evade arrest, and the severity of the crime at issue. *Id.* at 396. Only information known to the officer at the time the conduct occurred is relevant. *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017); *Glenn v. Washington Cty.*, 673 F.3d 864, 873 n.8 (9th Cir. 2011).

1.  *Whether Nehad Posed a Danger*

The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). The use of deadly force is only reasonable if a suspect "poses a *significant* threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (emphasis added) (internal quotation omitted).

Here, there is a genuine dispute as to whether Nehad posed a significant threat to Browder's safety.**[4]**  To be sure, there is some evidence in the record that Nehad did pose a threat to Browder.  Browder stated that he thought Nehad had a knife, and two witnesses heard Browder say some variant of, "Stop, drop it."  Browder further testified that Nehad was "aggressing" Browder's vehicle, and that Browder thought Nehad was going to stab him.  The question on summary judgment, however, is not whether some version of the facts supports Appellees' position, but rather whether a trier of fact, viewing the evidence in the light most favorable to Appellants, could find in Appellants' favor. *Blankenhorn*, 485 F.3d at 470.  We therefore proceed by viewing the evidence in the record through that lens.

---

**[4]** Although two bystanders were present in a parking lot adjoining the alley, Browder testified that he did not believe that anyone else was under threat of immediate bodily harm when he shot Nehad, and there is no evidence that either bystander was or felt threatened.

### a.  *Browder's Credibility*

As an initial matter, "summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016).  Here, approximately three hours after the shooting, Browder told homicide investigators that he did not see any weapons, and made no mention of feeling threatened by Nehad.  Five days later, however, after consulting with his attorney and reviewing surveillance footage inside a police station, Browder claimed that he thought Nehad had a knife, that Nehad was "aggressing" the car, and that he thought Nehad was going to stab him.  These possible inconsistencies, along with video, eyewitness, and expert evidence that belies Browder's claim that Nehad was "aggressing," are sufficient to give rise to genuine doubts about Browder's credibility.

### b.  *The Reasonableness of Browder's Beliefs*

Appellees, relying upon an out of context quotation from *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010), suggest that when examining the immediacy of the threat a suspect posed, the "critical inquiry is what the officer perceived."  Appellees are mistaken.  Where, as here, "an officer's particular use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact."  *See Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).[5]  "[W]hether

---

[5] *Wilkinson* is not to the contrary.  There, the question was whether a reasonable officer could have believed fellow officers were in danger where a suspect driver had failed to yield to police sirens or commands and was accelerating his vehicle in a muddy yard near two disoriented

the mistake was an *honest* one is not the concern, only whether it was a *reasonable* one." *Id.* at 1127.

In that regard, Appellees assert that it was not unreasonable for Browder to mistake a pen for a knife because Browder knew that someone matching Nehad's description had been reported as carrying a knife and there is evidence that Nehad was "fiddling with something" as he walked down the alley.[6] A reasonable trier of fact could, however, conclude that Browder's mistake was not reasonable. Appellants' police practices expert opined that officers are trained to recognize what suspects are carrying and to distinguish pens from knives, and that Browder had "very sufficient time to determine that it was not a knife in Nehad's hand and, in fact was a pen . . . ." Furthermore, one of the homicide investigators testified that the lighting in the alley was sufficient to enable an observer to identify the color blue in the pen, even taking into account the distance between

---

police officers. *Wilkinson*, 610 F.3d at 551. We explained that whether one of the disoriented officers was, in actuality, out of the suspect's vehicle's trajectory was less important than the shooting officer's reasonable perception, *uncontradicted by any evidence* and supported by bystander testimony, that his fellow officer had been run over and was in danger of being hit again. *Id.* We did not suggest, in *Wilkinson* or elsewhere, that the objective reasonableness of an officer's response is dependent upon that officer's subjective perceptions.

[6] Simmie Barber, a bouncer at a nearby club, told detectives that he had heard from Yoon that Nehad had a knife. Nehad showed Barber the shiny, polished, silver tip of what Barber understood to be a knife. Nehad did not threaten Barber in any way, and Barber was not worried. Although none of this information was known to Browder, Barber's testimony could support a finding of reasonable mistake, to the extent a factfinder could conclude that Nehad actually showed Barber the metallic tip of a pen and that Barber, too, mistook it for a knife.

Browder and Nehad. Whether Browder reasonably mistook the pen for a knife is therefore a triable question of fact.

### c. *Whether, Even if Armed, Nehad Posed a Threat*

Even if it were established that Browder reasonably believed Nehad was carrying a knife, or even if Nehad had actually been carrying a knife, Browder's use of lethal force was not necessarily reasonable as a matter of law. That a person is armed does not end the reasonableness inquiry. *Glenn*, 673 F.3d at 872; *see also Hayes v. County of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013) ("[T]he mere fact that a suspect possesses a weapon does not justify deadly force.") (alteration in original). Indeed, we have often denied summary judgment in excessive force cases to police officers who use force against armed individuals. *See, e.g.*, *N.E.M. v. City of Salinas*, 761 F. App'x. 698, 699–700 (9th Cir. 2019) (affirming denial of summary judgment to officers who shot garden shear-wielding suspect when he turned toward officers less than nine feet away, after having swung shears at officers); *S.B. v. Cty. of San Diego*, 864 F.3d 1010, 1014 (9th Cir. 2017) (finding triable issue where decedent was armed with a knife); *Hayes*, 736 F.3d at 1233–34 (same); *Glenn*, 673 F.3d at 878–79 (finding triable issue where police used beanbag rounds on knife-wielding subject prior to using lethal force); *cf. Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1017 (9th Cir. 2017) (denying summary judgment where decedent was holding toy AK-47 rifle).

Here, an eyewitness testified that Nehad "wasn't aggressive in nature" and "didn't make any offensive motions." Browder himself testified that Nehad did not say anything, make any sudden movements, or move the supposed knife in any way. Browder further testified that he

did not believe anyone else was under threat of immediate bodily harm when he shot Nehad. When Browder fired on Nehad, Nehad was seventeen feet away from Browder and walking at what Appellees' own expert described as a "relatively slow pace." Appellants' expert, Roger Clark, explicitly opined that Nehad "was actually not a lethal threat" to Browder. Under these facts, even if Browder had reasonably perceived Nehad as holding a knife, a reasonable factfinder could conclude that Nehad did not pose a danger to anyone.

### d.  *Browder's Role in Creating the Danger*

Appellees make much of the (asserted) fact that Browder had less than five seconds between the time he exited his vehicle and the moment he shot Nehad. We recognize, as we have often done before, that officers must act "without the benefit of 20/20 hindsight," and must often make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Gonzalez*, 747 F.3d at 794 (quoting *Graham*, 490 U.S. at 396–97); *see also Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). Sometimes, however, officers themselves may "unnecessarily creat[e] [their] own sense of urgency." *Torres*, 648 F.3d at 1127; *see also Porter v. Osborn*, 546 F.3d 1131, 1141 (9th Cir. 2008) ("When an officer creates the very emergency he then resorts to deadly force to resolve, he is not simply responding to a preexisting situation.").[7] Reasonable triers of fact can, taking the totality of the circumstances into account,

---

[7] Although *Porter* involved a Fourteenth Amendment claim, we looked to "analogous jurisprudence" involving Fourth Amendment excessive force claims. *Porter*, 546 F.3d at 1141.

conclude that an officer's poor judgment or lack of preparedness caused him or her to act unreasonably, "with undue haste." *Torres*, 648 F.3d at 1126.

Here, evidence in the record could support such a determination. As described above, Nehad was walking down the alley at a relatively slow pace without saying anything or threatening anyone. The lighting was sufficient to allow an observer to identify the color of a pen at a distance of seventeen feet, yet Browder, responding to a call about a man brandishing a knife, drove his car several car lengths into the alley, opened his door, then drove further toward Nehad before exiting his vehicle.[8] Although Browder himself testified that it is important that police officers identify themselves because people may respond differently once they know they are interacting with a police officer, it is undisputed that Browder never identified himself as a police officer or warned Nehad that he was going to shoot. Two witnesses, including Browder himself, could not recall Browder giving any verbal command or saying anything at all. Video surveillance shows that as Nehad continued to walk toward Browder, Browder stepped out sideways from the protection of his vehicle door, closed the door, and, less than two seconds later, fired.

Appellants' expert emphasized that Browder had "a lot of time" to determine what to do before shooting Nehad, but "squandered all the opportunities tactically." Appellants' expert further elaborated, "It is not a five second decision[,]"

---

[8] Nelson, who was facing away from Nehad until approximately ten seconds prior to the shooting, was able to see Nehad "fiddling with something in his midsection" from his position five to ten feet behind Browder.

and, "[Browder] had all the time he wanted to take . . . ."[9]
Given such evidence, a reasonable factfinder could conclude
that any sense of urgency was of Browder's own making.

### 2.  *The Severity of the Crime at Issue*

Also relevant to the reasonableness inquiry is the severity
of the crime at issue. *Graham*, 490 U.S. at 396. We have
applied this factor in two slightly different ways. In *Miller v.
Clark County*, 340 F.3d 959 (9th Cir. 2003), for example, we
emphasized the government's interest in apprehending
criminals, and particularly felons, as a factor "strongly"
favoring the use of force. *Miller*, 340 F.3d at 964. Under our
logic in *Miller*, a particular use of force would be more
reasonable, all other things being equal, when applied against
a felony suspect than when applied against a person suspected
of only a misdemeanor. Here, police dispatch records suggest
that Browder was assigned a "Priority 1" call regarding a
"417 (Threatening w[ith] weapon)" offense.     Because
brandishing a knife in violation of California Penal Code
§ 417 is only a misdemeanor, a strict application of *Miller's*

---

[9] Appellees make several references to the "21-foot rule that a suspect
can close a 21-foot distance before an officer can react." Although a
suspect's distance from an officer is undoubtedly a relevant factor in a
reasonableness analysis, there is evidence in the record calling into
question the applicability of the "21-foot rule" here. As Appellees' expert,
Geoffrey T. Desmoulin, acknowledged, Browder had more time than
average to react because, although the average time for an officer to
remove his gun, aim, and shoot is 1.5 seconds, Browder had already
unholstered his weapon, and took only 0.83 seconds to raise his weapon,
aim, and fire. Furthermore, even if the "rule" were applicable, that fact
would have to be balanced against Browder's potential role in creating the
urgent circumstances that made the rule applicable. *Torres*, 648 F.3d at
1127.

reasoning would provide little, if any, basis for a use of deadly force.

Perhaps recognizing this (notwithstanding their citation to *Miller*), Appellees argue that the police dispatcher's decision to characterize Yoon's 911 call as a "417" misdemeanor should not be dispositive because Nehad's reported conduct "posed a serious threat" and could have been characterized as felonious. This argument reflects the second way in which we have sometimes applied the severity of the crime factor. Although the danger a suspect posed is a separate *Graham* consideration, courts, including this one, have used the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied. *See, e.g.*, *Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017) (holding, where officer reasonably concluded that a burglary might be in progress, severity-of-crime factor weighed in favor of use of force because burglary is "dangerous" and "can end in confrontation leading to violence"), *cert. denied sub nom. Lowry v. City of San Diego, Cal.*, 138 S. Ct. 1283 (2018); *Smith v. City of Hemet*, 394 F.3d 689, 702–03 (9th Cir. 2005) (en banc) (holding, where suspect had physically assaulted his wife but was standing alone on his porch when officers arrived, "the nature of the crime at issue provid[ed] little, if any, basis" for the use of force); *Conatser v. City of N. Las Vegas*, No. 206CV01236PMPLRL, 2009 WL 10679150, at *6 (D. Nev. Nov. 9, 2009) (finding severity of the crime "very low" where no crime was in progress when police arrived, even though suspect might have threatened his mother before police arrived).

This severity-of-crime as proxy-for-danger approach, however, does little to support Appellees' arguments here. Even if Nehad had made felonious threats or committed a

serious crime prior to Browder's arrival, he was indisputably
not engaged in any such conduct when Browder arrived, let
alone when Browder fired his weapon.  A jury could,
therefore, conclude that the severity of Nehad's crimes,
whether characterized as a misdemeanor or an already
completed felony, did not render Browder's use of deadly
force reasonable.  *See Harris v. Roderick*, 126 F.3d 1189,
1203 (9th Cir. 1997) ("[T]he fact that [the suspect] had
committed a violent crime in the immediate past is an
important factor but it is not, without more, a justification for
killing him on sight.").[10]

3. *Whether Nehad Was Resisting or Seeking to Evade
   Arrest*

In analyzing whether a use of force was reasonable, we
also look to whether the suspect was resisting arrest.
*Graham*, 490 U.S. at 396.  Here, video of the incident clearly
shows that Nehad made no attempt to flee from Browder.
Appellees argue, nevertheless, that Nehad resisted by failing
to obey Browder's command to, "Stop, drop it."  As
discussed above, although two witnesses heard Browder give
a command a few seconds before firing, neither Nelson nor
Browder himself had any such recollection.  Thus, whether
Nehad resisted arrest by ignoring Browder's command is, at
best, a disputed issue of fact.

---

[10] We applied this principle in *Harris* notwithstanding the fact that the
suspect had fired upon, and possibly killed, a federal agent—a crime far
more serious than Nehad's suspected offense.  *See Harris*, 126 F.3d
at 1193.

### 4. *Other Factors*

Other factors, in addition to the three *Graham* factors, may be pertinent in deciding whether a use of force was reasonable under the totality of the circumstances. *Smith*, 394 F.3d at 701; *see also Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). Here, we consider whether Browder provided Nehad appropriate warnings and whether less intrusive alternatives to deadly force were available.

### a. *Failures to Warn*

### i. *Failure to Order to Halt*

In some cases, the absence of a warning or order to halt prior to deploying forceful measures against a suspect may suggest that the use of force was unreasonable. *Deorle v. Rutherford*, 272 F.3d at 1283–84. In *Deorle*, for example, we determined that "[s]hooting a person who is making a disturbance because he walks in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable" where "the officer neither orders the individual to stop nor drop the can or bottle . . . ." *Id.* at 1284 (finding use of beanbag round unreasonable). We recognize, of course, that it may not always be feasible for an officer to warn a suspect prior to deploying force. Here, however, as discussed above, there is evidence that, like the suspect in *Deorle*, Nehad was walking toward Browder at a slow, steady pace, with no indication of violent intent. And here, as in *Deorle*, there is evidence that Browder never ordered Nehad to halt or to drop whatever he was carrying. Such facts could support a conclusion that Browder's decision to shoot Nehad was unreasonable.

> *ii. Failure to Warn that Failure to Comply Would Result in the Use of Deadly Force*

Whether an officer warned a suspect that failure to comply with the officer's commands would result in the use of force is another relevant factor in an excessive force analysis. *Deorle*, 272 F.3d at 1284. The seemingly obvious principle that police should, if possible, give warnings prior to using force is not novel, and is well known to law enforcement officers. Indeed, it was already common police practice to warn recalcitrant suspects of imminent forceful measures when we decided *Deorle* nearly two decades ago. *Id.* ("Appropriate warnings comport with actual police practice. Our cases demonstrate that officers provide warnings, where feasible, even when the force used is less than deadly."); *see also Glenn*, 673 F.3d at 864 (holding that an officer's use of a beanbag round without an appropriate prior warning weighed against reasonableness, even though officers had earlier warned the suspect that they would use lethal force and the shooting officer did yell "beanbag, beanbag" before firing).[11] A prior warning is all the more important where, as here, the use of lethal force is contemplated. Even assuming Browder did command Nehad to "Stop, drop it," there is no dispute that Browder never warned Nehad that a failure to comply would result in the use of force, let alone deadly force.[12] A jury could consider

---

[11] Although Appellees assert that Browder did not have time to give a warning, whether a warning was feasible here is also a triable issue.

[12] A suspect's refusal to comply with police commands despite warnings of serious or deadly consequences, could, of course, weigh in favor of the use of force, either as an "other" factor or as an indication of the threat posed by the suspect. Conversely, a jury could view a suspect's behavior, including failure to comply with police commands, as innocuous

Browder's failure to provide such a warning as evidence of objective unreasonableness.

### iii.  *Failure to Identify as a Police Officer*

Although not specifically discussed by the parties, we have also considered as relevant a police officer's failure to identify himself or herself as such.  *See, e.g.*, *McKenzie v. Lamb*, 738 F.2d 1005, 1010–11 (9th Cir. 1984); *see also, e.g.*, *Vlasak v. Las Vegas Metro. Police Dep't*, 213 F. App'x 512, 514 (9th Cir. 2006) (unpublished disposition); *Bluestein v. Groover*, 940 F.2d 667,  1991 WL 136179, at *2 (9th Cir. 1991) (unpublished disposition); *Kiles v. City of N. Las Vegas*, No. 2:03CV01246 KJDPAL, 2006 WL 1967469, at *2, 4 (D. Nev. July 12, 2006), *aff'd*, 276 F. App'x 620 (9th Cir. 2008).  Here, Browder acknowledged he was trained to identify himself as a police officer and that it is important to do so, particularly before using force.  However, it is undisputed that Browder never verbally identified himself as a police officer or activated his police lights or siren.  A jury could consider those failures in assessing Nehad's response to Browder and in determining whether Browder's use of force was reasonable.

### b.  *Failure to Use Less Intrusive Alternatives*

Another relevant factor is "the availability of alternative methods of capturing or subduing a suspect."  *Smith*, 394 F.3d at 703 (citing *Chew v. Gates*, 27 F.3d 1432, 1441 n.5 (9th Cir. 1994)).  Police need not employ the least intrusive means available; they need only act within the range

where an officer gave no indication of any possible, let alone deadly, consequences.

of reasonable conduct. *Glenn*, 673 F.3d at 876 (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). "However, 'police are required to consider [w]hat other tactics if any were available,' and if there were 'clear, reasonable and less intrusive alternatives' to the force employed, that 'militate against finding [the] use of force reasonable.'" *Id.* (alterations in original) (quoting *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010)) (internal quotation marks omitted).

Here, Browder carried a taser, mace, and a collapsible baton in addition to his firearm. Appellants' expert described these less-lethal alternatives as "obvious," and it is undisputed that, at the time of the shooting, Nehad was within the taser's effective range. However, Browder admitted he never considered any of the available alternatives. Although Appellees contend the alternatives were not practical for various reasons, that is a question of fact best resolved by a jury. *See id.* at 877 (questions of fact precluded summary judgment where plaintiff's expert testified that taser, rather than beanbag round, was the "'ideal less-lethal option to temporarily disable the decedent, at approximately 15 feet away'").

### 5. *Conclusion*

Viewing the evidence in the light most favorable to Appellants, we conclude that a rational trier of fact could find that Browder's use of deadly force was objectively unreasonable.

B. *Fourteenth Amendment*

Nehad's parents also assert a claim for violation of their Fourteenth Amendment interest in the companionship of their child. Police action sufficiently shocks the conscience, and therefore violates substantive due process, if it is taken with either "(1) deliberate indifference or (2) a purpose to harm[,] unrelated to legitimate law enforcement objectives." *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (internal quotation marks omitted). Here, Appellants argue Browder's shooting satisfies the purpose to harm standard because Nehad assertedly posed no danger to Browder or anyone else.[13]

"The purpose to harm standard is a subjective standard of culpability." *Id.* It is well established that a use of force intended to "teach a suspect a lesson" or "get even" meets this standard. *Id.* at 1141. For example, in *A.D.*, we affirmed the denial of the defendant officer's motion for judgment as a matter of law in light of evidence that the decedent posed no danger to anyone and repeatedly insulted the officer before the officer shot her twelve times, even though no other officer opened fire and a supervisor had ordered the officer to stop. *A.D.*, 712 F.3d at 451. We have also reversed a grant of summary judgment where a police officer, who had reasonably fired eighteen shots at a suspect who had just stabbed another officer, walked in a circle around the suspect and then took a running start before stomping on the suspect's

---

[13] "The lower 'deliberate indifference' standard applies to circumstances where actual deliberation is practical." *A.D.*, 712 F.3d at 453 (internal quotation marks omitted). Although Appellants suggest in a brief footnote that the deliberate indifference standard "may apply," we limit our analysis to the argument Appellants actually raise.

head three times.  *Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017).

The circumstances here are distinguishable from those in *A.D.* and the like.  While those cases, like this case, did involve some evidence that a suspect posed no danger, they also involved some additional element suggesting an improper motive on the part of the shooting officer.  Here, there is no evidence that Browder fired on Nehad for any purpose other than self-defense, notwithstanding the evidence that the use of force was unreasonable.

Although "[o]bjective reasonableness is one means of assessing whether" conduct meets the "shocks the conscience" standard, an unreasonable use of force does not necessarily constitute a Fourteenth Amendment substantive due process violation.  *Brittain v. Hansen*, 451 F.3d 982, 991 n.1 (9th Cir. 2006) (citing *Moreland v. Las Vegas Metropolitan Police Dep't*, 159 F.3d 365, 371 n.4 (9th Cir. 1998) ("[I]t may be possible for an officer's conduct to be objectively unreasonable yet still not infringe the more demanding standard that governs substantive due process claims.")).  In *Gonzalez*, for example, we reversed a grant of summary judgment in officers' favor on a Fourth Amendment excessive force claim, but nevertheless affirmed the grant of summary judgment on a Fourteenth Amendment claim because "plaintiffs produced no evidence that the officers had any ulterior motives for using force . . . ."  747 F.3d at 797–98; *see also Hayes*, 736 F.3d at 1231.

We acknowledge that some district courts have indeed denied summary judgment on Fourteenth Amendment claims in the absence of evidence of bad intent separate and apart from evidence of an objectively unreasonable use of force.

*See, e.g.*, *F.C., III v. Cty. of Los Angeles*, No. CV 10-169 CAS (RZX), 2011 WL 13127347, at *4 (C.D. Cal. Sept. 13, 2011); *Ramirez v. Cty. of San Diego*, No. 06 CV 1111JM (JMA), 2009 WL 1010898, at *6–7 (S.D. Cal. Apr. 15, 2009). The circumstances of those cases, however, are easily distinguished from those presented here. In *FC, III*, for example, there was evidence that two officers shot a fleeing suspect in the back. 2011 WL 13127347, at *2. In *Ramirez*, there was evidence that an officer shot a fleeing robbery suspect twice in the leg and then, while the suspect was on the ground and possibly raising his hands in surrender, reloaded and shot the suspect six more times in the chest. 2009 WL 1010898, at *2.

Thus, although most meritorious purpose to harm claims will involve evidence of ulterior motive or bad intent separate and apart from evidence of an unreasonable use of force, we decline to hold that such evidence is required as a matter of law. In some cases, a use of force might be so grossly and unreasonably excessive that it alone could evidence a subjective purpose to harm. Here, Browder's use of force, even if unreasonable, does not present such a case. We therefore affirm the district court's grant of summary judgment on the Fourteenth Amendment claim.

## C. *Qualified Immunity*

A government official's entitlement to qualified immunity depends on "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). Courts may examine either prong first, depending on the

relevant circumstances. *Id.* Here, the district court granted Browder qualified immunity on the second prong.

A review of the district court's order, however, reveals that the court construed the facts in the light most favorable to Browder, asserting as established fact not only Browder's version of events, but also other facts favorable to Browder, such as the disputed fact that Browder verbally warned Nehad to "Stop[,] Drop it." "[W]hen there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by the jury before the court can rule on qualified immunity." *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017) (citing commentary to Ninth Circuit Model Civil Jury Instruction 9.34 (2017)); *see also Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010). As discussed above, there are numerous genuine disputes of material fact, which preclude a grant of summary judgment on qualified immunity.

Appellees argue that even if, under the Appellants' version of the facts, a constitutional right was violated, that right was not clearly established at the time of the shooting. That argument is unconvincing. In determining whether Browder's mistake as to what the law requires was reasonable, and thus whether he is entitled to qualified immunity under the clearly-established prong, we "assume []he correctly perceived all of the relevant facts and ask whether an officer could have reasonably believed at the time that the force actually used was lawful under the circumstances." *Torres*, 648 F.3d at 1127 (internal quotation marks omitted). This analysis must be made "in light of the specific context of the case, not as a broad general proposition." *S.B.*, 864 F.3d at 1015. There need not be a prior case "directly on point," so long as there is precedent

"plac[ing] the statutory or constitutional question beyond debate." *Id.*

Under Appellants' version of the facts, Browder responded to a misdemeanor call, pulled his car into a well-lit alley with his high beam headlights shining into Nehad's face, never identified himself as a police officer, gave no commands or warnings, and then shot Nehad within a matter of seconds, even though Nehad was unarmed, had not said anything, was not threatening anyone, and posed little to no danger to Browder or anyone else. Appellees cannot credibly argue that the prohibition on the use of deadly force under these circumstances was not clearly established in 2015. *Torres*, 648 F.3d at 1128 ("[F]ew things in our case law are as clearly established as the principle that an officer may not 'seize an unarmed, nondangerous suspect by shooting him dead' in the absence of 'probable cause to believe that the [] suspect poses a threat of serious physical harm . . . .'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985))). Indeed, nearly twenty years ago, we explained that it was sufficiently established that a police officer could not reasonably use a beanbag round on "an unarmed man who: has committed no serious offense, . . . has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals." *Deorle*, 272 F.3d at 1285.

Although Appellees attempt to distinguish *Deorle* because the suspect there was suicidal and officers took several minutes to observe him before using less than lethal force, those facts, to the extent they are distinguishing, weigh against qualified immunity in this case. Here, there is no evidence that any eyewitness to the shooting considered

Nehad to be a threat. In light of the evidence that Browder could have taken more time to evaluate the situation, Browder's brief observation of Nehad before using lethal force only makes Browder's conduct *less* reasonable. Browder is therefore not entitled to qualified immunity under the clearly established prong.

## D. *Monell and Supervisory Liability*

The district court granted summary judgment in favor of Zimmerman and the City on Appellants' *Monell* claim and in favor of Zimmerman on Appellants' supervisory liability claim on the grounds that (1) there was no constitutional violation, and (2) Appellants presented no evidence that "any policy or deficient training was a 'moving force' behind the shooting."[14] As discussed above, there are genuine disputes of material fact regarding the first basis for the district court's decision.

The record also belies the district court's second conclusion. As an initial matter, Appellants need not show evidence of a policy or deficient training; evidence of an informal practice or custom will suffice. *See Los Angeles Cty. v. Humphries*, 562 U.S. 29, 30, 36 (2010); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Appellants

---

[14] A local government is liable for a constitutional violation if its policies, official decisions, or informal customs cause the violation. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988). "A defendant may be held liable as a supervisor under [42 U.S.C.] § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks omitted); *see also Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).

submitted evidence that: (1) 75% of the San Diego Police Department's officer-involved shootings were avoidable; (2) the Nehad shooting was approved by the department, which took no action against Browder; and (3) the department looks the other way when officers use lethal force. Indeed, Chief Zimmerman explicitly affirmed that Browder's shooting of Nehad "was the right thing to do," and the department identified Browder as the victim of the incident and conducted his interview several days after the shooting, once Browder had watched the surveillance video with his lawyer. This evidence is sufficient to create a triable issue at least as to the existence of an informal practice or policy and, thus, *Monell* and supervisory liability.

E.  *State Law Claims*

1.  *Triable Issues of Fact Preclude Summary Judgment*

The district court concluded that because Browder's use of force was objectively reasonable, Appellees were entitled to summary judgment "on all state law claims." This included not only Appellants' state civil rights claims under California Civil Code §§ 52.1 and 52.3 and Appellants' assault and battery claim, but also two claims, for negligence and wrongful death, on which Appellees never sought summary judgment. As discussed at length above, whether Browder's use of force was objectively reasonable is a disputed issue of fact. We therefore reverse the district court's grant of summary judgment on all state law claims.[15]

---

[15] Appellees also argue, briefly, that Appellants' state civil rights claims under California's Bane Act require threats or intimidation other than an underlying use of excessive force. We have squarely rejected that argument, as has the California Court of Appeal. *See Reese v. Cty. of*

2. *Sua Sponte Grant of Summary Judgment on Negligence and Wrongful Death Claims*

Appellees do not dispute that Appellants' state law claims for negligence and wrongful death were not the subject of Appellees' motion for summary judgment and were not briefed to the district court. A district court may only grant summary judgment sua sponte if the losing party has reasonable notice that the claims are at issue and an opportunity to be heard. *Norse v. City of Santa Cruz*, 629 F.3d 966, 971–72 (9th Cir. 2010). Here, Appellants were not provided with such notice or opportunity. We therefore reverse the district court's grant of summary judgment on Appellants' negligence and wrongful death claims for that additional reason.[16]

## CONCLUSION

We conclude that there are several genuine disputes of material fact regarding Appellants' Fourth Amendment claim.

---

*Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (discussing *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766 (2017)). Although Bane Act claims do require the specific intent to deprive a person of constitutional rights, such intent can be proven by evidence of recklessness. *Id.* at 1045.

[16] Appellants raise the additional argument that summary judgment was improper because state law negligence claims are judged by different standards than federal constitutional claims. We have observed that state negligence law is indeed broader than federal Fourth Amendment law. *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1037–38 (9th Cir. 2018). Because, however, we reverse the district court's grant of summary judgment on Appellants' state law claims for the reasons discussed above, we need not and do not reach any question regarding the potential differences between state law and constitutional claims.

At a broad level, a triable issue remains regarding the reasonableness of Browder's use of deadly force. More specifically, there are genuine disputes about: (1) Browder's credibility; (2) whether Nehad posed a significant, if any, danger to anyone; (3) whether the severity of Nehad's alleged crime warranted the use of deadly force; (4) whether Browder gave or Nehad resisted any commands; (5) the significance of Browder's failure to identify himself as a police officer or warn Nehad of the impending use of force; and (6) the availability of less intrusive means of subduing Nehad. These disputed factual questions also preclude a grant of summary judgment on qualified immunity grounds, as it was well-established at the time of the shooting that the use of deadly force under the circumstances here, viewed in the light most favorable to Appellants, was objectively unreasonable. Appellants have also presented sufficient evidence of police department customs, practices, and supervisory conduct to support a finding of entity and supervisory liability. Furthermore, the district court never afforded Appellants an opportunity to be heard before granting summary judgment on the negligence and wrongful death claims sua sponte. We therefore **reverse** the grant of summary judgment on Appellants' Fourth Amendment and state law claims. We **affirm**, however, the grant of summary judgment on Appellants' Fourteenth Amendment claims.

**AFFIRMED IN PART; REVERSED IN PART; and REMANDED.**

**Each party to bear its own costs on appeal.**